UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREDY KAPLAN,

                              Plaintiff,

                  v.

NEW YORK STATE DEPARTMENT OF
LABOR,

                              Defendant.

18 Civ. 3629 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

This case remains among the most unusual in the Court's docket.
Plaintiff Fredy Kaplan and several of his female co-workers at the New York
State Department of Labor ("DOL" or "Defendant") claimed harassment at the
hands of a junior male co-worker.  The claims were investigated and
substantiated, and the co-worker was permitted to resign.  Shortly thereafter,
Plaintiff either did or did not confess to fabricating his allegations about the co-
worker.  A second investigation was commenced, at the end of which Plaintiff's
employment at DOL was terminated.  Plaintiff brought the instant lawsuit
against DOL and several of its current and former officers.  Earlier motion
practice resulted in the termination of claims against the individual
defendants; DOL now moves for summary judgment as to the remaining claims
against it, which are claims under Title VII of the Civil Rights Act of 1964,
*codified as amended at* 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), for
discrimination in the form of a hostile work environment and retaliation.  For
the reasons set forth in the remainder of this Opinion, the Court grants in part
and denies in part DOL's motion.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Hiring into DOL's Labor Standards Division

The Court has discussed the factual and procedural histories of this case in its prior Opinion resolving two motions to dismiss.  (Dkt. #70).  *See Kaplan* v. *N.Y.S. Dep't of Lab.*, No. 18 Civ. 3629 (KPF), 2019 WL 3252911 (S.D.N.Y. July 19, 2019) ("*Kaplan I*").[2]  However, because not all of Plaintiff's allegations have been borne out in discovery, the Court does not rely on its earlier factual recitation.

Plaintiff is an attorney who self-identifies as a Jewish man.  (Def. 56.1 ¶ 4).  In March 2015, Plaintiff was hired by Defendant to work in its Counsel's Office, which represents Defendant in a variety of administrative and litigation

---

[1]    The facts set forth in this Opinion are drawn from Defendant's Local Civil Rule 56.1 Statement ("Def. 56.1" (Dkt. #124)); Plaintiff's Local Civil Rule 56.1 Counterstatement, which is included in Plaintiff's opposition briefing ("Pl. 56.1" (Dkt. #127)); various declarations submitted by the parties (including the exhibits attached thereto), which are cited using the convention "[Name] Decl."; and certain deposition transcripts, which are cited using the convention "[Name] Dep."  For ease of reference, Defendant's opening brief is referred to as "Def. Br." (Dkt. #118); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #127); and Defendant's reply brief as "Def. Reply" (Dkt. #132).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Additionally, to the extent that Plaintiff purports to dispute facts in Defendant's Rule 56.1 Statement with inadmissible evidence, or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.

[2]    The earlier opinion misspells Plaintiff's first name as "Freddy."

proceedings.  (*Id.* at ¶ 3).  Plaintiff worked out of DOL's office on Varick Street in lower Manhattan.  (*Id.* at ¶¶ 2, 5).  From at or about the time of his hiring until September 2016, Plaintiff was assigned to litigate administrative proceedings on behalf of the Labor Standards Division.  (*Id.* at ¶ 5; Pl. 56.1 ¶ 5).

Several months after hiring Plaintiff, Defendant hired three recent law school graduates to work in the same unit and location as Plaintiff.  One, John-Raphael ("J.R.") Pichardo II, identified as male, while the other two, Roya Sadiqi and Taylor Waites, identified as female.  (Def. 56.1 ¶ 6).  In theory, all four attorneys were supervised by Kathleen Dix, an attorney in the Counsel's Office who was resident in Defendant's Albany office.  (*Id.* at ¶ 7).  As a practical matter, however, Plaintiff often advised and mentored the three more junior attorneys because of his prior legal experience.  (Pl. Dep. 74:2-4).

### 2.    The Claims of Workplace Harassment Against J.R. Pichardo[3]

In April 21, 2016, Dix forwarded to DOL's General Counsel Pico Ben-Amotz and Deputy Counsel Michael Paglialonga an email of the same date attaching a memorandum from Roya Sadiqi concerning workplace conditions — more specifically, abusive treatment that she and others had experienced at the hands of J.R. Pichardo.  (Def. 56.1 ¶¶ 15-16; Paglialonga Decl., Ex. A (email and memorandum)).  Sadiqi began by thanking Dix and another supervising attorney, Harry Dunsker, for speaking with her about

---

[3]     In the remainder of this Opinion, the Court uses the bowdlerizing conventions of the author/speaker when presenting statements with expletives.

these issues the preceding day.  (Paglialonga Decl., Ex. A at 2).  While acknowledging her discomfort, Sadiqi observed that "[t]he circumstances have worsened, and since it has come up I wanted to type out specifics."  (*Id.*).  However, Sadiqi made clear that she was not cataloguing every incident of potential misconduct by Pichardo, but rather those that "have had a direct impact on me and the work being done."  (*Id.*).

Much of Sadiqi's memorandum depicted Pichardo as an unprofessional boor, with little regard for his work or his co-workers except insofar as either might aid in his professional advancement at DOL.  (Paglialonga Decl., Ex. A at 2-5; *see also id.* at 5 (Sadiqi: "At a certain point I gave up trying to explain myself with him and now tend to ignore a lot of what he says and does, but most of it is still disrespectful, unprofessional and disruptive.")).  And indeed, Pichardo appeared to be an equal-opportunity miscreant, with his particular combination of disdain and laziness on display throughout the Labor and Standards Unit.  (*See generally id.* at 2-5).  At points in her memorandum, however, Sadiqi suggested that Pichardo's misconduct was based on her (and Waites's) gender: among other things, Sadiqi recounted numerous occasions in which Pichardo referred to her or Waites as a "bitch."  (*Id.* at 2).[4]

---

[4]      Though Sadiqi recounted in her memorandum instances in which Pichardo had been unprofessional to or regarding Plaintiff, she did not present such episodes as being related to any protected characteristic of Plaintiff's.  Rather, Sadiqi reported that Pichardo "had no respect for [Plaintiff] as a person let alone a supervising attorney." (Paglialonga Decl., Ex. A at 2).  Sadiqi also recalled that Pichardo had "called [Plaintiff] a few absurd names."  (*Id.*).  From other documents in the litigation, the Court understands these names to include "crack attorney" and/or "crack whore."  (Def. 56.1 ¶ 29).

After reviewing Sadiqi's memorandum, Paglialonga discussed her concerns with Ben-Amotz and Dix; the three agreed that Paglialonga and Dix would travel to Manhattan the following day, April 22, 2016, and meet with all four attorneys. (Def. 56.1 ¶ 12). In the course of their visit, Dix and Paglialonga counseled Pichardo regarding the conduct alleged in Sadiqi's memorandum, including his use of the epithet "bitch." (*Id.* at ¶ 13; Paglialonga Decl. ¶ 19). Sadiqi was moved into Plaintiff's office until Pichardo could be relocated, which happened in May 2016. (Def. 56.1 ¶¶ 14-15). Even then, Pichardo's abuse of Sadiqi continued; on the first business day after the supervisors' visit, April 25, 2016, Pichardo cornered Sadiqi in an attempt to get her to reveal the substance of her communications to Dix and Paglialonga, which conduct made Sadiqi "extremely uncomfortable." (*Id.* at ¶ 15). Indeed, Sadiqi was sufficiently disturbed by the encounter that Dix requested of Ben-Amotz and Paglialonga that Sadiqi be relocated immediately on a temporary basis. (*Id.* at ¶ 16; Pl. 56.1 ¶ 16).

Plaintiff participated in a conference call with Dix and Paglialonga regarding Pichardo on April 26, 2016. (Def. 56.1 ¶ 23). Though the call participants dispute how the topic came up, they agree that the conversation turned to the need to take more immediate action against Pichardo; Plaintiff and Dix recalled Paglialonga stating that a protected characteristic, such as race, was needed to file a complaint against Pichardo. (*Compare* Def. 56.1 ¶ 23, *with* Pl. 56.1 ¶ 23). In response, Plaintiff volunteered for the first time that Pichardo had made anti-Semitic comments about him. (Def. 56.1 ¶ 23;

*see also* Berg Decl., Ex. A at Requests for Admissions 3 and 4).[5]  Paglialonga

agreed to file a complaint (the "DEOD Complaint") on Plaintiff's behalf with

Defendant's Division of Equal Opportunity Development ("DEOD"), and did so

immediately after the call concluded.  (Def. 56.1 ¶ 18; *see also* Paglialonga

Decl., Ex. D (DEOD Complaint)).  The DEOD Complaint recited, in relevant

part, that Paglialonga had received reports from supervisees that "Mr. Pichardo

made Anti-Semitic and offensive remarks against Attorney Fredy Kaplan.  Also,

[Pichardo] has had issues with co-worker Roya Sadiqi."  (Paglialonga Decl.,

Ex. D at 2).

### 3.    The DEOD Investigation into Pichardo and His Termination

The then-Director of DEOD, Selica Y. Grant, reviewed the DEOD

Complaint, determined that it warranted an investigation into Pichardo's

comments to Plaintiff and his interactions with Sadiqi, and assigned to herself

responsibility for conducting the investigation.  (Def. 56.1 ¶¶ 31-32, 36; *see*

*generally* Grant Decl.).  As part of that investigation, on May 3 and 4, 2016,

Grant interviewed Dix, Sadiqi, Waites, and Plaintiff, and on May 16, 2016,

Grant interrogated Pichardo.  (Def. 56.1 ¶ 37; *see also* Grant Decl. ¶ 15

(distinguishing interviews from interrogations)).  As relevant to the instant

---

5       The precise comments are a matter of modest dispute among the parties.  Plaintiff
        recalls telling Paglialonga and Dix about (i) an incident in which Pichardo, while
        discussing approaches to settlement negotiations with Plaintiff, observed that he
        (Pichardo) "g[o]t to Jew them down" (Pl. Dep. 104:6-9, 135:21-25); and (ii) information
        Plaintiff had learned from a Labor Standards Investigator about Pichardo referring to
        Plaintiff outside of his presence as "a Jewish attorney or a Jew attorney" (*id.* at 113:2-
        116:13, 136:2-6).  Paglialonga recalled Plaintiff stating that Pichardo had called him a
        "fucking Jew" and a "Jew lawyer."  (Paglialonga Dep. 34:20-35:11).  Dix recalled Plaintiff
        saying that Pichardo had called Plaintiff a "crack whore," an "F'ing Jew," and a third
        comment she could not immediately recall.  (Dix Dep. 50:21-24).

motion, Grant recalled that Plaintiff recounted information from a Labor
Standards Investigator that Pichardo had once referred to Plaintiff (outside of
Plaintiff's presence) as a "f-ing Jew lawyer."  (Grant Decl. ¶ 17).  However,
Grant recalled Plaintiff advising her during his interview that he had never
heard Pichardo make any anti-Semitic comments directly to him.  (*Id.*).[6]

At the conclusion of her investigation, Grant prepared at least two letters
regarding the investigation that were both dated August 16, 2016.  (Grant
Decl., Ex. D-E)  One letter was to Plaintiff; it has been referred to earlier in this
litigation as the "August 16 Letter," and it stated in part that DEOD had found
"insufficient evidence to confirm that discrimination occurred under state or
federal law," but that there "was a finding that a violation of NYSDOL policy
[occurred] and administrative action may be taken to address the situation."
(*Id.*, Ex. D)  The second letter was to Pichardo; it recited that it was in
reference to the allegation "that you discriminated against Mr. Fredy Kaplan on
the basis of race and religion," and it reported conclusions substantively
identical to those reported to Plaintiff.  (*Id.*, Ex. E).

---

[6]     In her deposition testimony, Grant was less precise:  "I don't think [Plaintiff] in the
interview stated that it was said directly to him.  I think he said that he heard, he heard
it from someone else."  (Grant Dep. 52:15-18).  However, her contemporaneous notes
reflect the following:  "Fredy didn't hear JR directly say any anti-Semitic remarks or call
the other female attorneys a bitch."  (*Id.* at 163:22-24).

Plaintiff recalls the interview differently in a few respects:  For one thing, he recalls
clarifying that the comment he heard from the Labor Standards Investigator was not
"fucking Jew lawyer," but rather "Jew lawyer."  (Pl. Dep. 155:11-19).  Plaintiff also
recalled explaining to Grant the settlement discussions that he had with Pichardo in
which the "Jewing down" comment was made.  (*Id.* at 155:19-23).  When asked to
reconcile his testimony with Grant's notes, Plaintiff explained that "[o]ther than what
was said in front [of] me, yes, that I did not — outside of the Jewing down comment that
was said in front of me, I didn't hear any other comments."  (*Id.* at 158:10-13).

One week later, Grant prepared an internal memorandum dated August 23, 2016, to Nathaalie Carey, DOL's Deputy Commissioner of Administration and CFO, in which Grant noted in pertinent part:

> Through our investigation we determined probability that Mr. Pichardo called/referred to Mr. Kaplan as a "f*cking Jew," a "Jew lawyer," and a "crack whore." Witness statements not only confirmed that Mr. Pichardo called Ms. Sadiqi and Ms. Waites a "bitch" both directly and indirectly, but also revealed that Mr. Pichardo used anti-semitic language in reference to Mr. Kaplan.  It was confirmed that Mr. Pichardo made more than one inappropriate/derogatory statement about his co-workers, did not conduct himself in a professional manner during work hours and was not respectful of his co-workers' requests to refrain from using derogatory language to/about them.
>
> As a result, our office concluded that Mr. Pichardo violated NYSDOL's Workplace Harassment Policy (GA Manual Topic No. 0254) and recommend administrative action. The Policy states in part "[w]orkplace harassment is any unwelcome verbal or physical conduct that is severe or pervasive enough to create a hostile work environment[."]

(Grant Decl., Ex. F).[7]

One month later, on September 23, 2016, Paglialonga was advised by Grant of the results of the investigation and the options available, including counseling or terminating Pichardo's employment.  (Def. 56.1 ¶ 46; *see also*

---

[7]     At her deposition, Grant explained the basis of her "probability" finding:

> So that's why I stated that it was probable that Mr. Pichardo called Mr. Kaplan a fucking Jew lawyer and crack whore *because the witnesses cannot confirm they heard that exact language*, but based on a credibility analysis it was probable he said those things.
>
> We confirmed that he definitely called these women bitches, both directly and indirectly, and then made some other inappropriate comments about other co-workers.

(Grant Dep. 74:1-10 (emphasis added)).

Grant Decl., Ex. G (email exchange)).  Ben-Amotz, with Paglialonga's
concurrence, decided in favor of termination.  (*Id.* at ¶ 47; *see also* Grant Decl.,
Ex. G (October 5, 2016 email from Paglialonga to Grant discussing
contemplated termination)).  On October 11, 2016, Paglialonga informed
Pichardo of the decision to terminate the latter's employment and offered
Pichardo the option to resign in lieu of termination, which option Pichardo
accepted.  (Def. 56.1 ¶ 48; *see also* Paglialonga Decl., Ex. F (Pichardo
resignation letter dated October 11, 2016)).[8]

### 4.    The Dormin Investigation into Plaintiff and His Termination

It is here that the story takes a strange turn.  According to Kathleen Dix,
at an event held in Albany on October 18, 2016, Plaintiff admitted to her that
he had "made up" his claim that Pichardo had made anti-Semitic comments
about him.  (Def. 56.1 ¶ 49).  Specifically, Dix recalled Plaintiff telling her:
"[Y]ou know I made that up, right?  It turns out it was true." (*Id.*).  At his
deposition in this case, Plaintiff disputed that this exchange ever took place.
(Pl. Dep. 190:23-25).

Dix sat on this information for a period of months, sharing it only with
her supervisor and mentor, Harry Dunsker.  Ultimately, after a dispute with
Plaintiff that involved the misallocation of time entries resulting from a co-
worker's cat-sitting duties, Dix disclosed this information to Paglialonga and
Ben-Amotz on March 27, 2017.  (Def. 56.1 ¶ 49; *see also* Paglialonga Decl.,

---

[8]     By this time, in September 2016, Plaintiff had been reassigned to work in DOL's Bureau
of Public Works, where he was supervised by someone other than Dix.  (Pl. 56.1 ¶ 74).

Ex. G (March 28, 2017 email from Dix confirming conversations)).  According to
Palialonga, he and Ben-Amotz were concerned that the conduct ascribed to
Plaintiff — lying about a co-worker's involvement in conduct that could, and
did, result in a disciplinary investigation — might constitute "serious
misconduct and potential fraud and illegality by a State employee."  (Def. 56.1
¶ 51).  As a result, they referred Dix's statement to the New York State Office of
the Inspector General, which declined to exercise jurisdiction over the matter.
(*Id.*).  Paglialonga and Ben-Amotz then determined to conduct a second
investigation, this one focused on whether Plaintiff had falsely accused
Pichardo of making anti-Semitic slurs.  (*Id.* at ¶ 52).  In May 2017, they
referred the matter to John W. Dormin, a former Executive Director of
Defendant's Office of Special Investigations and a former Assistant Deputy
Attorney General, who was then employed by the New York State Insurance
Fund; Dormin agreed to take on the matter.  (*Id.* at ¶ 53; Dormin Decl. ¶ 9).

The ultimate scope of Dormin's investigation expanded to encompass the
conduct of three people — Plaintiff, with a focus on "whether he had provided
invented details of fictitious exchanges with Pichardo as a basis for his
April 26, 2016 accusation that Pichardo made anti-Semitic comments" (Def.
56.1 ¶ 56), and Dix and Dunsker, with a focus on their decisions not to
disclose the October 2016 exchange between Dix and Plaintiff to their
supervisors (*id.* at ¶ 57).  With the aid of an employee from Defendant's Office
of Employee Relations, Dormin interviewed 15 witnesses and conducted key

10

word searches in approximately 3,400 emails.  (*Id.* at ¶ 58).  Interview subjects

included both Plaintiff and Dix.  (Dormin Decl. ¶ 21).

Dormin's investigation culminated in his Employee Misconduct

Investigation report, dated August 7, 2017 (the "Dormin Report" (Dormin Decl.,

Ex. A)).  In relevant part, the Dormin Report concluded as follows:

- Plaintiff's recollection of instances of anti-Semitic comments by Pichardo came to light only after Paglialonga had informed Plaintiff and Dix that Pichardo's comments to Sadiqi — which by then had been the subject of one memorandum, several meetings, and numerous emails — "were not enough for more serious action such as discipline." (Dormin Report 3).

- Dormin found that Plaintiff had changed his story over time.  In his April 26, 2016 telephone conference with Dix and Paglialonga, Plaintiff recalled Pichardo calling him "Jew lawyer, fucking Jew, and crack-whore." (*Id.* at 5).  However, when interviewed by Selica Grant, Plaintiff stated "that he never heard Pichardo say anything anti-Semitic in his presence," and that he had only heard the "fucking Jew lawyer" comment secondhand. (*Id.*).  And in his interview with Dormin, Plaintiff offered a third version, in which Pichardo supposedly stated to him that an opposing lawyer was "jewing down — you know how jew lawyers are." (*Id.*).  Upon further questioning by Dormin, Plaintiff admitted that the source of this new information was in fact Taylor Waites, and not his firsthand knowledge. (*Id.* at 6).

- Plaintiff did not deny Dix's report of the October 2016 conversation in its entirety.  Rather, Plaintiff mused "that he might have told Ms. Dix that 'he wasn't 100% sure about the "Jew down" thing, but it turned out to be true!'" (*Id.* at 5).[9]

---

[9]    Plaintiff was not specifically confronted with this portion of the Dormin Report during his deposition.  However, he did testify that when asked by Dormin about Dix's recollection, he "vehemently denied" making the statement.  (Pl. Dep. 203:17-22).

- Dormin found Plaintiff to be incredible during his interview because (i) he offered inconsistent information regarding Pichardo's purportedly anti-Semitic comments; (ii) he declined to answer, or answered evasively, certain questions; and (iii) his demeanor changed during the interview, inasmuch as "[h]e looked away from us, his speech became slower and he appeared to be calculating answers rather than reporting his memories." (*Id.*).

- Dormin also found no support for Plaintiff's claims. To the contrary, Dormin interviewed the two employees who sat outside of Pichardo's office during the relevant time period, another employee who sat in an adjoining office, and several Labor Standards Division investigators. None could recalling hearing Pichardo make any anti-Semitic comments. (*Id.* at 6).[10]

- The only person (apart from Plaintiff) to recall Pichardo making an anti-Semitic comment was Sadiqi, who described the comment to Grant during the latter's investigation, but who did not contemporaneously share this information with Plaintiff. (*Id.* at 4, 6).[11]

- Given Plaintiff's evasiveness, Dormin's interviews of percipient witnesses in the Labor Standards Division, and Dix's account of Plaintiff's ostensible recantation (which Dormin found credible for a variety of reasons, including the dangers to Dix's own employment

---

[10]     *See also* Dormin Decl. ¶¶ 32-33:

> I am aware that during the DEOD investigation, witnesses stated that Pichardo had made anti-Semitic comments to Sadiqi, referring to Plaintiff. As the report makes clear, our investigation included interviewing all those whom the Plaintiff suggested had told him of the anti-Semitic comments, and they all denied either hearing such comments or communicating them to Plaintiff.

> Our investigation, therefore, corroborated Plaintiff's admission to Dix that he invented the allegations. I concluded that whether Pichardo had in fact made such comments had no bearing on Plaintiff's misconduct because Plaintiff did not have a factual basis for his accusations when making his complaint against Pichardo on April 26, 2016.

[11]     At one portion in the Dormin Report, Dormin relates that Sadiqi shared the information with Plaintiff. However, Dormin appears to have meant to refer to Grant in this attribution, given the remainder of the paragraph and the discussion of the Grant interview two pages later. (*See* Dormin Report 4, 6).

occasioned by her reporting of it), Dormin "conclude[d] that [Plaintiff] invented these allegations of anti-Semitic remarks made by Mr. Pichardo. He made these false allegations to increase pressure on management to terminate Pichardo's employment." (*Id.* at 5).[12]

- Dormin also investigated Dix's and Dunsker's decision not to volunteer this information sooner. According to Dix, after hearing from Plaintiff that he had "made up" the anti-Semitism allegations against Pichardo, she initially did nothing, in part because of other pressing work obligations and in part because "[s]he understood from Ms. Grant's letter closing the DEOD investigation that the anti-Semitic allegations were unfounded." (*Id.* at 4). Dix further explained that a later episode in which Plaintiff and Waites had supposedly conspired to file false time entries "convinced her that [Plaintiff] was untrustworthy." (*Id.*).

- Dix's explanation for her reticence, however, was complicated by her ill-advised decision to send "a glowing and false letter of recommendation to the Bronx County District Attorney on behalf of Mr. Pichardo." (*Id.*).

- Shortly after her conversation with Plaintiff, Dix had recounted the episode for her former supervisor, Dunsker, who found the situation confusing, inasmuch as it involved "an allegation of anti-Semitism that was not found credible by DEOD, and Kaplan admitting that he made up the allegations, but the allegations were true." (*Id.* at 4). Dunsker did not recall providing any advice to Dix on this issue.

---

[12] Plaintiff concedes that his interview with Dormin was marked by an abrupt change in tone, but offers a less inculpatory explanation for that change. According to Plaintiff, Dormin began the interview by not disclosing its purpose, instead questioning Plaintiff on a variety of benign work-related topics. (*See* Pl. Dep. 200:16-203:10; *see also id.* at 202:22-23 ("Oh, you know, just following up on some stuff.")). At some point, Dormin brought up Dix's report that Plaintiff "made these allegations up about Pichardo" (*id.* at 203:20), which Plaintiff denied; even then, Dormin brushed aside (at one point, literally waving his hand) Plaintiff's concerns that he should have an attorney present with him. (*Id.* at 204:7-19). At some point, however, the tone of Dormin's interview became "accusatory." (*Id.* at 204:25, 205:12).

13

Dormin concluded that Plaintiff's conduct violated New York State law and the New York Rules of Professional Conduct; he recommended that Plaintiff's position be terminated and that he be referred to the Appellate Division for discipline.  (Dormin Report 7-8).  He concluded similarly that Dix's withholding of information and submission of a false recommendation letter violated state law, professional responsibility codes, and DOL policy, and recommended that she also be fired and referred for professional discipline.  (*Id.*).  Dunsker's conduct, however, was found not to warrant discipline.  (*Id.*).

After obtaining approval from DOL's Executive Deputy Commissioner, Paglialonga and Ben-Amotz agreed to terminate Plaintiff's employment.  (Def. 56.1 ¶ 64).  As with Pichardo, Plaintiff was offered the opportunity to resign in lieu of termination in a meeting with Paglialonga and Ben-Amotz convened on October 10, 2017.  (*Id.* at ¶ 65).  Plaintiff rejected the offer on October 16, 2017, and he was fired that day.  (*Id.* at ¶¶ 66, 68).  Dix resigned from her position.  (*Id.* at ¶ 67).

## B.   Procedural History

Plaintiff filed his initial complaint in this action on April 24, 2018, naming DOL and various individual defendants.  (Dkt. #1).  On August 21 and 28, 2018, the defendants requested leave to file motions to dismiss.  (Dkt. #38, 41).  On September 25, 2018, the Court held a status conference and granted leave to Plaintiff to amend the complaint.  (Dkt. #49).  On October 29, 2018, Plaintiff filed an amended complaint.  (Dkt. #51).

On December 7, 2018, DOL and the individual defendants filed motions to dismiss the amended complaint and supporting declarations. (Dkt. #58-63). On January 7, 2019, Plaintiff filed his combined opposition to the motions to dismiss (Dkt. #64), and on January 18, 2019, the defendants filed their respective reply submissions (Dkt. #65-67).

The Court resolved the motions by Opinion and Order dated July 19. 2019. (Dkt. #70). *See generally Kaplan I*, 2019 WL 3252911. In brief, the Court dismissed Plaintiff's state and local law claims against the defendants for lack of jurisdiction pursuant to the Eleventh Amendment. *Kaplan I*, 2019 WL 3252911, at *3-5. The Court also dismissed Plaintiff's Title VII claims against Defendant Roberta Reardon, which claims Plaintiff had withdrawn. *Id.* at *6. The Court allowed to proceed to discovery Plaintiff's Title VII claims against Defendant DOL for hostile work environment and retaliation. *Id.* at *6-11.

After a protracted period of discovery, Defendant DOL filed its motion for summary judgment and supporting papers on August 18, 2020. (Dkt. #117-24). Plaintiff filed his opposition papers on September 18, 2020 (Dkt. #127), and briefing concluded with the submission of Defendant's reply papers on October 2, 2020 (Dkt. #132-33). On March 5, 2021, Plaintiff sought leave to reopen discovery based on newly-acquired information. (Dkt. #135). The Court sought and received an *in camera* submission from Plaintiff supporting his request on March 9, 2021. (Dkt. #136-37). After reviewing the *in camera* submission, the Court determined not to reopen discovery, concluding that the information proffered in Plaintiff's submission would not impact the Court's

15

decision on the pending motion.  The Court denies this motion without prejudice, however, to its renewal in connection with the scheduling of a trial date.

## DISCUSSION

### A.      Summary Judgment Under Federal Rule of Civil Procedure 56

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[13]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323), the party opposing summary judgment "must do more than

---

[13]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, … conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

**B.    The Court Grants Summary Judgment in Favor of Defendant as to Plaintiff's Hostile Work Environment Claim Under Title VII**

**1.    Applicable Law**

Title VII provides that "it shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult [based on, *inter alia*, religion or ethnicity] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment, Title VII is violated."  *Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (quoting *Harris* v. *Forklift Sys., Inc.*, 501 U.S. 17, 21 (1993)) (alteration added).  In order to prove the existence of a hostile work environment, a plaintiff must show both (i) that the alleged behavior was "severe or pervasive enough to create an objectively hostile or abusive work environment"; and (ii) that the plaintiff "subjectively perceive[d] that environment to be abusive."  *Duch* v. *Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold* v. *New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *accord Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).

A work environment is "abusive" when harassment has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment."  *Raniola* v. *Bratton*, 243 F.3d 610, 617

(2d Cir. 2001) (quoting *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 67 (1986)).  "On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*'"  *Schiano*, 445 F.3d at 600 (emphasis in original) (quoting *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)).  In making this determination, the court, assessing the totality of the circumstances, examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Cristofaro* v. *Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (quoting *Pucino* v. *Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)).

"The incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Raspardo* v. *Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also Alfano*, 294 F.3d at 380 (concluding that proffered incidents of harassment "were too few, too separate in time, and too mild ... to create an abusive working environment"); *see generally Agosto* v. *N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020).  While a single incident can suffice to substantiate a claim of hostile work environment, such an incident would have to be "extraordinarily severe."

*Desardouin* v. *City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013).

Furthermore, the plaintiff "must demonstrate that the conduct occurred

because of" his protected status — here, Plaintiff's religion and ethnicity — and

also that a "specific basis exists for imputing the conduct that created the

hostile environment to the employer."  *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 221

(2d Cir. 2004).

### 2.    Analysis

At the time of the motion to dismiss, the Court was presented with the

following allegations that Plaintiff had been subjected to a hostile work

environment:

> Plaintiff argues that Pichardo's anti-Semitic statements,
> "misogynistic rants," and refusal to follow Plaintiff's
> instructions and orders, taken together, meet the
> standard set by the courts for a hostile work
> environment under Title VII.  While Kaplan "personally
> overheard" Pichardo talk about "Jewing someone
> down," he also became aware of "incessant anti-Semitic
> comments [made] out[side] of his presence" by
> Pichardo.   Furthermore, Plaintiff states that he had
> received a letter from DOL confirming that Pichardo had
> engaged in anti-Semitic behavior, but nonetheless
> declining to discipline him.  Plaintiff states that these
> facts demonstrate that he faced conduct severe or
> pervasive enough that a reasonable person would find
> it hostile or abusive, and there is a basis for imputing
> this conduct to DOL.

*Kaplan I*, 2019 WL 3252911, at *8.  Accepting the well-pleaded allegations in

Plaintiff's Amended Complaint, and unable to consider Grant's August 16,

2016 letter to Plaintiff, the Court concluded that Plaintiff had "adequately

alleged that Pichardo 'engage[d] in a steady barrage of opprobrious racial

comments.'"  *Id.* (quoting *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir.

1997)).  The Court made clear, however, that Plaintiff was not guaranteed a trial on this claim: "The Court observes that many of Plaintiff's claims seem to hinge on the existence of a letter from DOL that Plaintiff argues differs from the August 16 Letter.  If this letter is not produced in discovery, the Court is skeptical that Plaintiff's claim can survive further motion practice."  *Id.* at *11.

In fact, as Defendant suspected, there was no letter apart from the August 16 Letter, and that letter did *not*, as Plaintiff alleged, condone any anti-Semitic statements by Pichardo.  (*Compare* Def. 56.1 ¶ 43 ("Plaintiff never received a communication from DOL 'confirming that Mr. Pichardo had made comments that were both anti-Semitic and created a hostile work environment, but, indicating said behavior is acceptable at the DOL, no corrective action would be taken [*sic*].'" (alteration in original)), *with* Pl. 56.1 ¶ 43 ("Undisputed for purposes of the instant motion.")).  The August 16 Letter concluded merely that DEOD had found "insufficient evidence" of a violation of state or federal law, but sufficient evidence of a violation of DOL policy.  (Grant Decl., Ex. D).  And as noted, given differences in recollection among the witnesses, Grant's internal memorandum to her supervisor recited only "probability" that Pichardo made particular anti-Semitic comments about Plaintiff.  (*Id.*, Ex. F).

The evidence of actionable conduct by Pichardo against Plaintiff was also far less than alleged in the Complaint.  When considering his time at DOL, Plaintiff recalled a single conversation in his presence in which Pichardo had, in the course of discussing negotiating tactics, "used the term, like I get to Jew them down."  (Def. 56.1 ¶ 21).  After discussing the comment with Plaintiff,

Pichardo apologized for it and never repeated it, in substance or in sentiment, in Plaintiff's presence. (*Id.* at ¶¶ 22, 25). Even after the exchange, Plaintiff was unperturbed; Plaintiff "didn't think of [Pichardo] as he hates Jews. I am thinking of him, he is ignorant, and he doesn't know." (*Id.* at ¶ 24). During this same general time frame, Plaintiff learned from a Labor Standards Investigator that Pichardo had referred to Plaintiff outside of his presence as "a Jewish attorney or a Jew attorney." (*Id.* at ¶ 26; *see also* Pl. Dep. 116:10-13 ("And it was more like, you know, yeah, I heard him refer to you as a Jew attorney, or the fact that you are Jewish as an attorney, or something like that.")).[14] Here, again, Plaintiff was unaffected by the information: "And I was like, whatever." (Def. 56.1 ¶ 26).

After the DEOD Complaint was filed on Plaintiff's behalf, and while Grant's investigation was pending, Plaintiff learned from Sadiqi that Pichardo had referred to him as a "crack attorney" or a "crack whore," neither of which implicated a protected characteristic of Plaintiff's. (Def. 56.1 ¶ 29). Sadiqi also mentioned an incident in which Pichardo had stated, outside of Plaintiff's presence, that Plaintiff — who has tattoos of Buddha on his forearm — "need[ed] to choose between being Jewish or Buddhist." (*Id.* at ¶ 27). As with prior Pichardo comments, Plaintiff found them more indicative of Pichardo's idiocy than offensive. (*Id.* at ¶ 28 ("Again, it was an eye roll for me, basically.

---

[14]   The Court has no admissible evidence that Pichardo ever made such a comment. However, inasmuch as the parties discuss Plaintiff's contemporaneous receipt of this hearsay statement as a possible basis for Plaintiff's hostile work environment claim, the Court considers it as well.

Like he is an idiot, is basically how I felt.")).  And while Plaintiff did perceive the "Jew them down" and "Jew attorney" comments as anti-Semitic, he did not consider Pichardo's "make a choice" comment to be anti-Semitic, inasmuch as it was a challenge to, rather than discrimination based on, one's religious beliefs.  (Pl. Dep. 191:18-23, 192:22-194:3, 194:15-17).[15]

Pichardo's comments, while plainly inappropriate, "were too few, too separate in time, and too mild ... to create an abusive working environment." *Alfano*, 294 F.3d at 380; *see also Langlois* v. *Hartford Bd. of Educ.*, 831 F. App'x 548, 552 (2d Cir. 2020) (summary order) (upholding grant of summary judgment after concluding that "[t]he few isolated comments allegedly made by the school principal, mentioned previously, do not meet [the hostile work environment] threshold"); *Milord-Francois* v. *N.Y.S. Off. of Medicaid Inspector Gen.*, No. 19 Civ. 179 (LJL), 2020 WL 5659438, at *21 (S.D.N.Y. Sept. 23, 2020) (granting summary judgment in favor of defense where hostile work

---

[15]  Long after Pichardo had left Defendant's employ, during the course of Dormin's investigation into Plaintiff, Dix related to Dormin that Sadiqi had stated that Pichardo made anti-Semitic remarks "on a daily basis," although Sadiqi apparently could remember none of these remarks.  Plaintiff understandably sets great store by this information in opposing Defendant's motion for summary judgment.  (Pl. Opp. 18).  The Court will not consider it in assessing Plaintiff's hostile work environment claims.  To begin, Sadiqi was not deposed in this litigation, and there is no admissible evidence that she made the statement.  Nor was Dix questioned about this statement during her deposition in this case.  (*See generally* Dix Dep.).  Most important, Plaintiff learned of the statement, if at all, after Pichardo had left DOL.  It cannot therefore substantiate his hostile work environment claim.

Plaintiff also cites an incident in which Pichardo is alleged to have taken approximately 20 case files from his office that Plaintiff needed for a trial.  (Pl. 56.1 ¶ 73).  The Court has received no admissible evidence that Pichardo took the files; Plaintiff recalls Sadiqi telling him that Pichardo had taken them, and the Court has no statement from Sadiqi, Pichardo, or anyone else with firsthand knowledge.  (Pl. Dep. 88:20-21).  Even were the Court to credit that the theft occurred, this one-time incident, untethered from any allegations of discriminatory intent, does not support, alone or in tandem with the other evidence, Plaintiff's hostile work environment claim.

environment claim was predicated on a handful of incidents involving stray comments by a single subordinate employee); *Obi* v. *Westchester Med. Reg'l Physician Servs., P.C.*, No. 19 Civ. 3022 (VB), 2020 WL 1434159, at *8 (S.D.N.Y. Mar. 23, 2020) ("Three comments allegedly made to plaintiff — that she should keep quiet because of her race; that she could not ask a white, Jewish doctor for assistance; and that as a 'black African,' she should go back to her 'poor country' — objectively rise to the level of racial hostility, but are not severe or pervasive enough to sustain a hostile work environment claim."); *cf. Aulicino* v. *N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009) ("For racist comments, slurs, and jokes to constitute a hostile work environment, ... there must be more than a few isolated incidents of racial enmity." (quotation marks omitted)); *Feingold*, 366 F.3d at 150 (reversing grant of summary judgment for hostile work environment claim that involved mocking of Jewish-sounding names, comments about Jewish lawyers, and referring to "Jewish pig food").[16] Moreover, none of Pichardo's comments was physically threatening or humiliating.  And Plaintiff's measured reactions to Pichardo's comments make

---

[16]   Plaintiff's own deposition testimony confirms the Court's conclusion:

Q.   Well, did Roya [Sadiqi] ... ever tell you that Pichardo was making nonstop anti-Semitic comments?

A.   No.

Q.   Did Taylor [Waites] ever tell you that?

A.   No.

Q.   Did anybody ever tell you that?

A.   No.

(Pl. Dep. 139:10-17).

plain that such comments did not unreasonably interfere with Plaintiff's work performance and, further, that Plaintiff did not "subjectively perceive that environment to be abusive."  *Alfano*, 294 F.3d at 374.[17]

Even if Plaintiff had raised a genuine dispute regarding a hostile work environment — and he has not — Plaintiff failed to establish a basis for imputing liability to Defendant.  Under Title VII, an employer is liable for the harassing conduct of a non-supervisory employee only if it either "failed to provide a reasonable avenue for complaint" or if "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Duch*, 588 F.3d at 762, *cited in Legg* v. *Ulster Cty.*, 979 F.3d 101, 115 (2d Cir. 2020); *see generally Wiercinski* v. *Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015).  Plaintiff concedes that Pichardo was a non-supervisory employee.  (Def. 56.1 ¶ 8).

During the relevant time period, Defendant maintained both a Workplace Harassment Policy (Grant Decl., Ex. A) and a Non-Discrimination Policy (*id.*, Ex. B).  And as information regarding Pichardo's discriminatory conduct was transmitted to the appropriate managers, the policies were put to use.  With particular respect to Plaintiff, Paglialonga drafted the DEOD Complaint on Plaintiff's behalf on April 26, 2016, immediately after Plaintiff communicated to

---

[17]    Plaintiff suggests that the Court should find the requisite severity and pervasiveness from Grant's internal memorandum, which stated that Pichardo's conduct had violated DOL's Workplace Harassment Policy, which itself includes the "severe and pervasive" language.  (Pl. Opp. 18-19; Grant Decl., Ex. F).  Significantly, however, that memorandum also included discussion of Grant's substantiated findings regarding Pichardo's treatment of his female co-workers.  (Grant Decl., Ex. F).

him Pichardo's anti-Semitic statements.  (Paglialonga Decl., Ex. D).  A few weeks later, Grant reviewed the complaint and commenced an investigation. (Grant Decl. ¶ 13).  The following month, Grant interviewed Plaintiff, Pichardo, and other percipient witnesses to Plaintiff's allegations.  (*Id.* at ¶¶ 14-19).  By that time, Pichardo had been relocated to the far end of the Varick Street office. (Def. 56.1 ¶ 14).  After reviewing Grant's report, Paglialonga and Ben-Amotz obtained authorization to terminate Pichardo's employment; presented with the options of resignation or termination, Pichardo resigned on October 11, 2016. (*Id.* at ¶ 48).  Thus, Defendant maintained a reasonable avenue for complaints *and* took appropriate remedial action upon receiving Plaintiff's complaint.  For this independent reason, Plaintiff's hostile work environment claim fails.

## C.   The Court Denies Summary Judgment as to Plaintiff's Claim of Retaliation

As suggested by the Factual Background, the Court finds more perplexing the events that followed Pichardo's termination.  No one — including the two investigators, Grant and Dormin — disputes that Pichardo made anti-Semitic comments regarding Plaintiff, though they may quibble about the precise comments.  No one, except perhaps Kathleen Dix, believes that Pichardo's firing was based on flawed (or, worse yet, fabricated) premises.  And yet Plaintiff was fired, supposedly for making up allegations of anti-Semitic statements by Pichardo that resulted in Pichardo's firing.  On the unique factual circumstances of this case, the Court would likely have done what Defendant did, which is to convene an independent investigation into Dix's claims of Plaintiff's recantation.  But on these same unique factual

26

circumstances, the Court finds that Plaintiff has identified a genuine dispute of material fact regarding whether the reasons given for his termination are pretextual.

### 1.    Applicable Law

Retaliation claims under Title VII are analyzed using the familiar burden-shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), for disparate-treatment discrimination cases.  *See Reynolds* v. *Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  In particular, a Title VII "plaintiff alleging retaliation bears a similar burden [to a plaintiff alleging sex discrimination] to establish a *prima facie* case, which requires evidence 'showing that [i] [he] engaged in protected activity, [ii] the employer was aware of this activity, [iii] [he] was subjected to an adverse employment action, and [iv] a causal connection exists between the adverse action and her protected activity.'"  *Carter* v. *Autozoners, LLC*, 807 F. App'x 131, 132 (2d Cir. 2020) (summary order) (quoting *Bentley* v. *Autozoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019)).  An "adverse employment action" in the retaliation context is broader than for discrimination claims: "The proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination."  *Davis-Garett* v. *Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (alterations and quotations omitted).

"A causal connection [between the protected activity and the adverse action] can be shown either [i] indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or [ii] directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky* v. *City of New York*, 921 F.3d 337, 353 (2d Cir. 2019); *Hicks* v. *Baines*, 593 F.3d 159, 170 (2d Cir. 2010); *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

If the plaintiff makes out a *prima facie* case, a rebuttable presumption of retaliation arises, and the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. *See Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). If the employer succeeds, the presumption of retaliation is rebutted, and the burden shifts back to the plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Treglia* v. *Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (quoting *Cifra* v. *Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *accord Miceli* v. *Mehr*, 830 F. App'x 63, 64-65 (2d Cir. 2020) (summary order); *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 179 (2d Cir. 2005).

Finally, a "plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a

'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan* v. *Andalex Group LLC*, 737 F.3d 834, 835 (2d Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr.* v. *Nassar*, 570 U.S. 338, 360 (2013)).  In this regard, the Second Circuit teaches that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, ... only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. The plaintiff can make such a showing "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Toombs* v. *N.Y.C. Housing Auth.*, 830 F. App'x 665, 668 (2d Cir. 2020) (summary order) (quoting *Kwan*, 737 F.3d at 846).[18]

### 2. A Genuine Dispute of Fact Exists Concerning Whether Plaintiff's Termination Was Retaliatory

Before addressing Defendant's arguments for summary judgment, the Court addresses the parties' antecedent dispute concerning the specific protected conduct that Plaintiff alleges is the basis for his retaliation claims.  In his opposition papers, Plaintiff asserts that he was retaliated against by Defendant for speaking out about both sexist and anti-Semitic comments by Pichardo.  (*See* Pl. Opp. 26 ("Plaintiff's claim concerning Pichardo's anti-Semitic and sexist behavior [is] one and the same.")).  But as Defendant notes (Def.

---

[18]    Plaintiff does not allege, and the Court accordingly does not discuss, whether Defendant could be liable under a "cat's paw" theory of liability.  *See generally Menaker* v. *Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019); *Vasquez* v. *Empress Ambulance Serv., Inc.*, 835 F.3d 267, 274-75 (2d Cir. 2016).

Br. 13, 25), Plaintiff claimed a narrower class of protected activity during his

deposition:

> Q.   Are you claiming in this lawsuit that DOL
>      retaliated against you for anything other than
>      your complaint that Pichardo made anti-Semitic
>      comments about you?
>
> A.   Am I making claims other than that?  No.
>
>                      * * *
>
> Q.   In other words, your retaliation claim is based on
>      the fact that you made a complaint that Pichardo
>      made anti-Semitic or disparaging comments
>      about you on the basis of your religion; is that
>      right?
>
> A.   Yes.
>
> Q.   And nothing else?
>
> A.   Yes.  Correct.

(Pl. Dep. 240:17-22, 240:25-241:8).  Accordingly, the Court will consider only

Plaintiff's complaints to his supervisors about anti-Semitic statements

attributed to Pichardo.

Defendant focuses its arguments on the issue of causation, claiming first

that any temporal link is too distant (Def. Br. 22-23), and second that an

intervening event broke the causal chain (*id.* at 23-24).  In arguing the former

claim, Defendant cites to the Court's discussion of the 18-month gap between

Plaintiff's complaint and his termination in *Kaplan I*.  (*Id.* at 23).  In so doing,

however, Defendant omits the more germane portion of the Court's analysis:

> However, the Court finds that Plaintiff has plausibly
> alleged a retaliatory motive in a different manner.  "A
> plaintiff may assert causal connection through
> allegations of retaliatory animus, or else by

30

circumstantial evidence, such as close temporal proximity between the protected activity and the retaliatory action." *Perry* v. *State of N.Y. Dep't of Labor*, No. 08 Civ. 4610 (PKC), 2009 WL 2575713, at *6 (S.D.N.Y. Aug. 20, 2009), *aff'd sub nom. Perry* v. *N.Y. Dep't of Labor*, 398 F. App'x 628 (2d Cir. 2010) (summary order). Here, Plaintiff has alleged that he made a complaint based on discrimination (Am. Compl. ¶¶ 36-37); that DOL accepted that complaint as true (*id.* at ¶ 40); and that DOL then accused him of fabricating a complaint that it had already accepted as true in order to justify its termination of his employment (*id.* at ¶¶ 44-52). The Court must accept these allegations as true at this stage of the litigation. *Accordingly, an assertion of close temporal proximity alone is unnecessary, because here DOL is alleged to have reversed its position regarding a complaint it had already accepted as true. This offers a stronger circumstantial case for a pretextual retaliatory firing than mere temporal proximity.* If Plaintiff's version of events were accurate, DOL, with full awareness of the truth of his complaints, fired him on the pretext that he fabricated the complaints. The Court concludes that these allegations plausibly state a retaliatory motive for Plaintiff's termination. Plaintiff's retaliation claim therefore survives.

*Kaplan I*, 2019 WL 3252911, at *10 (emphasis added). Though the Court's analysis of Plaintiff's claims is now undertaken pursuant to Rule 56, the fact remains that Plaintiff does not need to rely on, and is not relying on, temporal proximity to demonstrate his *prima facie* case. Rather, Plaintiff is claiming that, irrespective of its timing, his termination was the but-for consequence of him engaging in the protected activity of complaining about Pichardo's anti-Semitic conduct. The record in this case would seem to bear that out. Plaintiff was fired for speaking out against Pichardo. Whether Plaintiff's statements were factually accurate comes into play at a different part of the analysis.

In response, Defendant argues that the intervening event of the Dormin investigation vitiates Plaintiff's causation argument.  (Def. Br. 23).  And it is true that courts have recognized that an intervening event can break the causal chain.  *See Rossbach* v. *Montefiore Medical Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 930710, at *6 (S.D.N.Y. Mar. 11, 2021) ("But even when the protected activity is followed closely in time by an adverse employment action, an intervening event between the protected activity and the adverse employment action may defeat an inference of causation." (collecting cases)); *see also Brennan* v. *Legal Aid Soc'y*, No. 19 Civ. 7756 (VSB), 2020 WL 6875059, at *5 (S.D.N.Y. Nov. 23, 2020) (collecting cases).  But these cases are not relevant to the analysis here, where (i) Plaintiff is not relying on temporal proximity to satisfy the causation element and (ii) the putative intervening event is itself inextricably intertwined with the protected activity.

For purposes of this motion, the Court finds that Plaintiff has satisfied his burden of demonstrating a *prima facie* case of retaliation under Title VII: Plaintiff engaged in protected conduct in reporting Pichardo's anti-Semitic statements to Dix, Paglialonga, and others; his employers were aware of his conduct; he suffered an adverse employment action in the form of the termination of his employment; and his protected conduct was the but-for cause of his termination.  That said, the Court also finds that Defendant has met its burden of presenting a non-pretextual reason for Plaintiff's firing:  A

subsequent, independent investigation concluded that Plaintiff had fabricated his claims of personal knowledge that Pichardo had used anti-Semitic slurs.[19]

The issue devolves to whether Plaintiff has identified a genuine issue of fact as to whether the reason given for his termination, *i.e.*, information obtained during the Dormin investigation, was pretextual. In finding that Plaintiff has, the Court wishes to make clear several points about what it is *not* saying. The Court is not saying that an independent investigation cannot serve as an intervening cause or a non-retaliatory explanation under the *McDonnell Douglas* test. The Court is also not saying that a plaintiff can forestall summary judgment merely by disputing the results of an internal investigation. And the Court is not here opining on the relative credibility of witnesses or the quality of either of the Grant or Dormin investigations.

On the singular facts of this case, however, the Court is constrained to find a genuine dispute of fact regarding whether the proffered non-retaliatory basis for Plaintiff's termination was pretextual. In large measure, this is because the Court credits, as it must, Plaintiff's sworn testimony in this case. *See Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (noting that "a district court generally 'should not weigh evidence or assess the credibility of witnesses'" (quoting *Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996))). Plaintiff asseverates that the conversation with

---

[19]     Defendant weakly suggests that Plaintiff's termination was also related to certain ill-defined "performance" issues. (Def. Br. 24; Def. 56.1 ¶ 64). The Court does not find sufficient evidence in the record to find this suggestion to suffice as a second non-retaliatory basis for Plaintiff's termination. As Plaintiff noted, he had not been given notice of any of these issues prior to his termination. (Pl. Dep. 223:5-20).

Dix that led to the Dormin investigation and his consequent firing simply did not happen.  Plaintiff also maintains that he was consistent in his statements to Paglialonga and Dix, and later to Grant, and that in each case he communicated to them anti-Semitic statements made by Pichardo of which he had both firsthand and secondhand knowledge.  Grant concluded in the course of her investigation — and, tellingly, continues to believe today — that such statements were made, and relied on witnesses other than Plaintiff to confirm these conclusions.  (Grant Dep. 75:6-76:3, 76:22-77:13 (confirming that witnesses other than Plaintiff had related that Pichardo had made anti-Semitic comments about Plaintiff); *see also id.* at 73:5-74:6, 74:12-75:4, 142:5-19, 150:17-151:9 (same); *id.* at 150:11-16 (Grant unable to recall whether Plaintiff himself confirmed that such statements were made)).  In so doing, Grant confirmed at least half of what Plaintiff had related to Paglialonga and Dix.[20]

The Dormin investigation focused not on whether Plaintiff had been accurate in reporting that Pichardo had made anti-Semitic comments *to Plaintiff*, but rather the broader issue of whether "Pichardo made anti-Semitic and other derogatory comments *about [Plaintiff]*."  (Dormin Report 2 (alteration and emphasis added)).  The Court continues to have difficulty reconciling Grant's conclusions that Pichardo made anti-Semitic remarks (which, it bears repeating, were substantiated by sources other than Plaintiff), with Dormin's

---

[20]    And, crediting Plaintiff's deposition testimony at this stage, Grant simply misperceived Plaintiff's statements to her that he had firsthand and secondhand knowledge of anti-Semitic statements by Pichardo, and thus confirmed the latter category but not the former category.

conclusion that only one slur was made by Pichardo, and that Plaintiff was not made aware of the slur contemporaneously with either its issuance or Grant's investigation into it. There is also merit to Plaintiff's argument that Dormin discredited him simply for not knowing the name of the relevant Labor Standards Investigator. And, if Plaintiff's testimony is to be believed, any change in tone during Dormin's interview of him was attributable to Dormin's "gotcha" style of interviewing rather than Plaintiff's realization that he had been caught lying.

It is also significant to the Court that Dormin found "[m]ost compelling" Kathleen Dix's account of Plaintiff's purported recantation. Despite the clear findings of Grant's investigation, Dix appears to believe that Pichardo got a raw deal from DOL. (Dix Dep. 36:23-37:22, 61:5-63:9, 159:4-11 (discussing belief and/or disbelief in truth of allegations against Pichardo); *see also id.* at 97:21-23 (acknowledging "favorable recollections of Mr. Pichardo")). Indeed, despite the execrable conduct by Pichardo outlined earlier in this Opinion, Dix chose to send what Dormin referred to as a "glowing and false letter of recommendation to the Bronx Count District Attorney on behalf of Mr. Pichardo." (Dormin Report 5; *see also* Pl. 56.1 ¶ 80; Dix Dep. 149:20-152:18 (reaffirming statements made in recommendation letter)). Reliance on Dix is also curious insofar as, despite obvious affection for Pichardo, she sat on information supposedly obtained from Plaintiff that exculpated Pichardo for five months, and only decided to come forward with this information after an unrelated

dispute with Plaintiff that involved cat-sitting and time-entry violations by another DOL employee.

In sum, the Court cannot and does not weigh in on which of Plaintiff or Dix is more credible, or which of the Grant investigation or the Dormin investigation is more accurate. But on this record, which includes confirmation of the very information that Plaintiff is alleged to have fabricated regarding Pichardo, the Court finds a triable issue as to Plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claim for discrimination in the form of a hostile work environment is dismissed, while Plaintiff's claim for retaliation is sustained. The Clerk of Court is directed to terminate the motion at docket entry 117.

The parties are directed to meet and confer, and to submit a joint letter to the Court outlining proposed next steps in the case, on or before **April 23, 2021**.

SO ORDERED.

Dated:      March 22, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge